**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BRETT SOLOWAY, | |
| Plaintiff, | Civil Action No. _____ |
| v. | **JURY TRIAL DEMAND** |
| ALM GLOBAL, LLC,<br>and HUGO GUZMAN, | |
| Defendants. | |

**COMPLAINT**

Plaintiff Brett Soloway ("Soloway" or "Plaintiff"), by and through his attorneys, brings this Complaint against ALM Global, LLC ("ALM"), and Hugo Guzman ("Guzman") (collectively, "Defendants"), and states as follows:

**INTRODUCTION**

1.     Lying has consequences. For Mr. Brett Soloway, Defendants' lying destroyed his esteemed thirty-year legal career and his immeasurable business reputation. In what could only be a desire to publish "click-bait" articles, Defendants wholly ignored the truth and singlehandedly ruined the reputation and career of Mr. Soloway. What is worse? After Defendants received notice, in writing, that their story about Mr. Soloway was false and defamatory, they doubled down on their dishonest publication. They published another version of the story, maintaining the defamatory content and leaving Mr. Soloway with no choice but to file this lawsuit. Defendants chose to place oversized significance on increasing their website clicks (and thereby profits) at the expense of a hardworking and distinguished businessman.

2.     On April 14, 2023, ALM published Hugo Guzman's false and defamatory story (the "April Article") about Mr. Soloway on the Internet via several of its online legal publications.

1

Defendants published the Article through multiple publication platforms so as to gain as much readership as possible. The April Article incorrectly connected Mr. Soloway's amicable departure from his position as General Counsel at Cushman & Wakefield plc ("Cushman") with a completely unrelated, sensational court finding in a case involving former-President Donald Trump. In July 2022—seven months before Mr. Soloway departed Cushman—a Justice in New York ruled against Cushman related to its compliance with subpoenas from an investigation into former-President Trump. Notably, that court finding was later stricken before the publication of the Article, and Cushman's involvement in the Trump matter ended.

3.     The April Article claimed that because of this utterly unrelated sensational court finding involving former-President Trump, Mr. Soloway was replaced as Cushman's GC. **In sum, Defendants falsely claimed that Mr. Soloway was fired for his job performance regarding Cushman's routine motion practice in a highly publicized New York case involving Trump.**

4.     Nothing could be further from the truth. Mr. Soloway departed Cushman on independent and friendly terms in March 2023. He was not replaced as General Counsel in the "wake of [Cushman]'s rebuke by judge in Trump probe," as the defamatory article claimed. In fact, the Justice's "rebuke" was later overturned, which was easily discoverable on the public court docket. Mr. Soloway's departure from Cushman was not related, **in any way**, to any legal proceedings involving former-President Trump.

5.     Mr. Soloway's departure had nothing to do with (1) his job performance; (2) any legal matters to which Cushman was a party; or (3) anything to do with former-President Trump. Connecting Mr. Soloway's departure to each of these themes—**with no source whatsoever**—was a blatant and reckless disregard for the truth that has caused Mr. Soloway irreparable harm.

6.     Publishing lies about Mr. Soloway's legal career on multiple ALM online publications was particularly harmful to Mr. Soloway's previously unblemished reputation in the legal community. ALM publishes articles through multiple platforms including Law.com directly to "the legal, financial services, benefits, consulting, property and casualty insurance, and real estate industries."[1] Because of the nature of these publications and their intended audience, any content published by ALM on its multiple platforms would, and did, directly impact the reputation of a legal executive like Mr. Soloway. The ALM and Law.com publications where these Articles were published (Corporate Counsel and New York Law Journal) were and are still read by persons in Mr. Soloway's specific professional industry, including his current and future business contacts and—most damningly—his future employment prospects.

7.     Mr. Soloway is on the job market. However, he would soon learn that Defendants' Article (published shortly after he departed Cushman) would have a much more devastating impact on his reputation and employment prospects than he ever could have imagined. Despite his immaculate resume and stellar experience, he has been excluded from consideration and ignored by recruiters after the defamatory Article was published. His name has been removed from lists as even a potential candidate. He has been snubbed in employment interviews and by business recruiters. He has seen firsthand how the Article negatively affects his interviews for potential employment opportunities.

8.     Mr. Soloway, through counsel, wrote to Defendants, requesting that they remove the April Article. Defendants refused to do so. Even after being told that the article was false and defamatory by both Cushman and Mr. Soloway, Defendants refused to publish a retraction or take the Article down. Instead, in September 2023, Defendants published another version of the April

---

[1] "About Us," Law.com, *available at* https://www.law.com/static/about-us/ (last accessed Apr. 10, 2024).

Article, keeping the defamatory implications about Mr. Soloway wholly intact (the "September Article").

9.        On information and belief, Defendants refused to take down or correct the April Article because it was attracting a lot of website visitors for them. Stories about former-President Trump and his legal battles are top click generators for website platforms, including Law.com and its Corporate Counsel and New York Law Journal publications. By refashioning the story into the September Article, Defendants retained their website click generations while republishing the story and maintaining website traffic.

10.        Mr. Soloway has always kept a limited, if practically non-existent, online presence. He does not post any content about himself on the Internet. He does not have a LinkedIn profile. He is a private figure. Because of his limited online presence, Defendants' defamatory articles are among the first items that appear when "Brett Soloway" is searched on Google. (*See* Fig. 1, below). (At the time the April Article was first published, it was the topmost Google hit for "Brett Soloway."). The negative impact of the false and defamatory Law.com Articles appearing first or near the top of Google search returns on Mr. Soloway—*as he is seeking employment*—cannot be overstated.



*__Figure 1__*: **Google Search results for "Brett Soloway" (last accessed April 4, 2024).**

11.     Defendants' false and defamatory Articles have cost Mr. Soloway his thirty-year legal career and given him no other choice but to pursue legal action to repair his reputation.

## PARTIES

12.     Plaintiff Brett Soloway is a United States citizen. Mr. Soloway resides in Bannockburn, Lake County, Illinois. Mr. Soloway has been an attorney for thirty years. He earned his Juris Doctorate from the University of Illinois, Champaign-Urbana, *cum laude*, in 1993.

13.     Mr. Soloway's career quickly took off. He was in private practice at two large, esteemed international law firms before moving to serve as Vice President of Development and General Counsel at Red Seal Development Corp. In 2002, he began working in the legal department at The Home Depot, Inc., an international home improvement retailer. When Mr. Soloway left The Home Depot in 2014, he had ascended to Senior Director of Legal, managing a

team of 15 lawyers that were responsible for all legal matters relating to store and distribution center operations for the company worldwide.

14.    In 2014, Mr. Soloway took a position as Executive Vice President, General Counsel, and Secretary with DTZ, a London-based commercial property company. When DTZ merged with two other large commercial real estate firms (Cushman and Cassidy Turley) in 2015, Mr. Soloway was selected to continue to serve as the General Counsel of the newly formed Cushman. Mr. Soloway served in that position for over 9 years.

15.    Mr. Soloway had a remarkable and unblemished career at Cushman. For example, he flawlessly executed Cushman's initial public offering in August 2018. He oversaw 125 people worldwide and all of Cushman's legal efforts: SEC regulations, litigation, employment and human resources compliance, risk management efforts, and more. As General Counsel, Mr. Soloway oversaw outside counsel that Cushman hired for litigation matters. Mr. Soloway was the only person at Cushman to serve as a Director of Cushman's Charitable Foundation from its inception through his departure in March 2023.

16.    Defendant ALM is a Delaware for-profit limited liability company with its principal place of business located at 150 East 42nd Street, Mezzanine Level, New York, New York 10017. Upon information and belief, ALM's sole member is ALM Media Holdings, Inc., a Delaware corporation having its principal place of business at 150 East 42nd Street, Mezzanine Level, New York, New York 10017.

17.    ALM is a for-profit multi-media company whose corporate website sets forth its mission: to "be the world's most trusted information, data, intelligence, and content company supporting both the practice of and business of professionals in the legal, financial services,

insurance, commercial real estate and benefits industries."[2] ALM's website asserts that ALM serves a community of over 7 million business leaders and practicing professionals.[3]

18.     Defendant ALM provides information directly to the industry of professionals that Mr. Soloway is a part of and the industries upon which Mr. Soloway's thirty-year career is built.

19.      According to ALM's website, Law.com is the company's legal industry division. The ALM website describes Law.com as a platform that "set[s] the agenda for customers to get and stay in the know about the biggest developments and most impactful trends in the legal industry" and was "[b]uilt using the strong historical foundation of ALM's brands serving the global legal community[.]"[4]

20.     Law.com is a subscription-based service. Once users subscribe to Law.com, they can access the articles published on multiple Law.com brands. Users can also subscribe to newsletters for various Law.com brands, including brands such as Corporate Counsel and New York Law Journal.

21.     ALM published the defamatory Articles about Mr. Soloway on at least two of ALM's brands available on Law.com: Corporate Counsel and New York Law Journal.

22.     ALM's Law.com directly provides information to the industry of professionals that Mr. Soloway is a part of and the industries upon which Mr. Soloway's thirty-year career is built. On information and belief, Law.com receives approximately 1.52 million monthly website visits.

---

[2]      *See* https://www.alm.com/company/ (last accessed Apr. 10, 2024).

[3]      *See* https://www.alm.com/ (last accessed Apr. 10, 2024).

[4]      *See* https://www.alm.com/industries/legal-2/ (last accessed Apr. 10, 2024).

23.     Corporate Counsel is an ALM media brand[5] published on Law.com that published the defamatory article on April 14, 2023.[6]

24.     New York Law Journal is an ALM media brand[7] published on Law.com that also published the defamatory article on April 14, 2023,[8] and posted it on Twitter (now known as X) on that same date with the caption, "Cushman Replaces GC in Wake of Company's Rebuke by Judge in Trump Probe."[9] The tweet links to the defamatory article.

25.     Defendant Hugo Guzman "is a reporter on ALM's in-house desk based in California, covering legal departments at disruptive technology companies, as well as labor and employment issues involving the NLRB, EEOC and other regulators."[10]

26.     Defendant Guzman wrote both the April Article and the September Article about and directed at Mr. Soloway, which were published on April 14, 2023, and September 26, 2023, respectively.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

28.     This Court has personal jurisdiction over Defendants because: (a) upon information and belief, ALM was registered to do business in Illinois in 2023 until such registration was revoked by the Illinois Secretary of State on September 8, 2023; (b) Defendants have made their

---

[5]     *See* https://www.law.com/corpcounsel/ (last accessed Apr. 10, 2024).
[6]     *See* https://www.law.com/corpcounsel/2023/04/14/cushman-replaces-gc-on-heels-of-companys-rebuke-by-judge-in-trump-probe/ (last accessed Apr. 10, 2024).
[7]     *See* https://www.law.com/newyorklawjournal/static/about-us/ (last accessed Apr. 10, 2024).
[8]     *See* https://www.law.com/newyorklawjournal/2023/04/14/cushman-replaces-gc-on-heels-of-companys-rebuke-by-judge-in-trump-probe/ (last accessed Apr. 10, 2024).
[9]     *See* https://twitter.com/NYLawJournal/status/1646890724267368448 (last accessed Apr. 10, 2024).
[10]    *See* https://www.law.com/author/profile/hugo-guzman/?slreturn=20230925161758 (last accessed Apr. 10, 2024).

content, including the articles and tweet at issue here, available to Illinois residents; (c) Defendants knew this State and District were Plaintiff's place of residence and principal place of business; (d) Defendants' tortious conduct targeted an Illinois citizen that resides in this State and District; (e) Defendants knew that their tortious conduct would injure the reputation of and cause economic injury to Plaintiff, who resides in this State and District; (f) the defamatory article was and is accessible to and has been viewed by individuals in this State and District; and (g) the defamatory tweet that links to the article was and is accessible to individuals in this State and District. In addition, Defendants knew Cushman is located in Chicago, Illinois.

29.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim asserted herein occurred in this District; the defamatory article and tweet were published in Illinois by Defendants.

## FACTUAL ALLEGATIONS

### I.     Cushman (and Mr. Soloway's) Minimal Involvement in the *New York v. Trump Organization* Matter in the Summer of 2022

30.     In September 2021 and February 2022, Cushman was subpoenaed by the New York Attorney General to provide documents relating to appraisals of Trump Organization properties in the matter *New York v. The Trump Organization, Inc., et al.*, Index No. 451685/2020. The civil case against Trump—like all Trump-related litigation—was highly publicized. The AG accused the Trump Organization of financial fraud by presenting vastly disparate property values to lenders and tax officials. Cushman was not accused of wrongdoing.

31.     Cushman responded in part to the subpoenas and also moved to quash in part on confidentiality grounds. (Dkt. No. 817). In July 2022, Justice Engoron held Cushman in contempt of court for failure to timely respond. In August 2022, after an appeal by Cushman, the Court ordered that Cushman was "purged" of its "contempt of court" and further held that "no fines were

paid or need to be paid." (Dkt. No. 825). **All of this information—including Cushman's motion to quash, the subsequent order of contempt, and the order reversing the contempt—are available on the New York Court public docket. Notably, Mr. Soloway's name does not appear anywhere in conjunction with the docket or the contempt order (or even in any public filings for the matter).**

32.     Two outside counsel law firms provided legal assistance to Cushman regarding its subpoena response in the Trump matter. As General Counsel, Mr. Soloway oversaw outside counsel (as he did with all Cushman litigation matters where outside counsel was hired) but did not personally interact with the Court regarding this case.

33.     After Cushman's contempt order was purged in August 2022, Cushman's involvement in the *Trump Organization* litigation was no longer of interest to the media. The media continued covering that litigation without mentioning Cushman. The routine subpoena motion practice that Cushman undertook was complete, and the "story" about Cushman's "involvement" in the *Trump Organization* matter went cold.

34.     The *Trump Organization* matter went to trial. The media covered that trial extensively. Cushman was not involved in that trial and not mentioned by the media in conjunction with the trial. The *Trump Organization* matter went up on appeal. The media is covering that appeal extensively. Cushman is not involved in that appeal and remains absent from any media coverage in conjunction with the appeal. **Cushman was a non-party undertaking routine motion practice in the *Trump Organization* matter. The only reason Cushman was in the news at all was because all legal matters involving former-President Trump and the Trump Organization attract a media circus. Cushman's *Trump Organization* motion practice (and**

10

the media circus it drew) ended positively for Cushman and, by proxy, its General Counsel Mr. Soloway.

35.     Seven months later, in March 2023, Mr. Soloway voluntarily resigned from Cushman on amicable terms. Under SEC regulations, Cushman was not required to publicly announce Mr. Soloway's departure, nor did Mr. Soloway want a public announcement. Mr. Soloway is a private person. Mr. Soloway wanted to take time off of work for a well-deserved break and to determine the next stage of his career. At the time of his departure from Cushman, Mr. Soloway earned approximately $2 million per year.

36.     Mr. Soloway's resignation from Cushman, and the later hiring of a new General Counsel, was not a matter of public concern.

37.     Mr. Soloway has never been involved in any controversy involving a matter of general public interest or concern, the outcome of which would impact the general public or some portion thereof in an appreciable way—this includes, but is not limited to, the *New York v. Trump Organization* litigation. Mr. Soloway is a private figure. Indeed, Mr. Soloway has always kept a low profile online. He does not have a social media presence and does not have a LinkedIn page nor a Facebook profile. He made no appearances in the *Trump Organization* matter.

## II.     Defendants Published a Defamatory Article about Mr. Soloway in April 2023 on Multiple Online Platforms

38.     On April 14, 2023, eight months after Cushman was temporarily found in contempt and seven months after that contempt order was rescinded by the Court, ALM published an article written by "in-house desk" reporter Defendant Hugo Guzman titled, "*Cushman Replaces GC in Wake of Company's Rebuke by Judge in Trump Probe*"[11] (the "April Article"). The headline of the Article alone, in addition to the Article as a whole, are false and defamatory. The Article

---

[11] A copy of the article as it appeared in ALM's Corporate Counsel publication is attached hereto as **Exhibit 1**.

incorrectly connects Mr. Soloway's retirement as Cushman's General Counsel to a "Trump Probe."

39.     The headline sets the tone and context for the Article. Instead of presenting a factual, straightforward story about a transition in a key legal position of a company, the Article tied Mr. Soloway's resignation from Cushman to an unrelated legal matter involving Trump. The phrase "in wake of" sends a clear message: Mr. Soloway did something wrong as General Counsel for Cushman and related to the outcome of a Trump-associated legal dispute where Cushman was a third party that warranted Cushman letting him go and finding a replacement.

40.     The Article, the beginning of which is shown below, identifies Mr. Soloway by name. The article is of and concerning him.



41.     The headline of the April Article is false and defamatory. Cushman did not make a unilateral decision to replace Mr. Soloway as General Counsel. Mr. Soloway was not fired. He was not asked to leave. There was not even a suggestion by Cushman that Mr. Soloway leave or find other employment. Instead, Mr. Soloway decided to leave the company to take some time off

after working there for over nine years, and to then pursue other opportunities. Mr. Soloway **voluntarily** left his position at Cushman, **on friendly terms** with the company.

42.     Mr. Soloway's departure from Cushman had nothing to do with any decision by the "Judge in a New York case" involving Trump, or any "Trump Probe." Any statement or insinuation otherwise is false.

43.     These false claims lower Mr. Soloway's otherwise unblemished reputation in the eyes of the professional legal community in which he has worked for over thirty years. The false statements in this Article have in fact deterred third parties from interacting with Mr. Soloway in his search for employment.

44.     Linking the departure of Mr. Soloway from his position as General Counsel of Cushman to something that happened in connection with a "Trump Probe" is false, and states and implies that Mr. Soloway was unfit and lacked efficacy and competency in his performance as General Counsel. This is especially damaging to Mr. Soloway's reputation because the Article is tailored to a legal audience, which includes his peers and potential future employers in the legal community.

45.     The Article does not cite any sources for its false and defamatory headline connecting Mr. Soloway's departure with a "Trump Probe." Neither Defendant Guzman nor the editors for Defendant ALM and Law.com contacted Mr. Soloway or Cushman before they published the Article.

46.     Defendants published the April Article in Corporate Counsel, a publication and brand of ALM. They also published the Article in New York Law Journal, another publication and brand of ALM. (Both of these publications are available on Law.com, which is owned by ALM). **By publishing the same Article on multiple ALM and Law.com-branded publications,**

**Defendants used their wide-reaching online platform to reach as many readers as possible with the defamatory story about Mr. Soloway.**

47.     On information and belief, once published by ALM and Law.com in (at least) the publications Corporate Counsel and New York Law Journal, the April Article was available to all Law.com website subscribers, including legal industry professionals and—importantly—future employment prospects for Mr. Soloway. The April Article was published to garner website clicks and, on information and belief, was wildly successful in doing so. With over 1.5 million visitors per month to Law.com, potentially *millions of people* saw the false and defamatory article about Mr. Soloway. The headline, at the very least, is also available to *anyone* who conducts a Google search of Mr. Soloway's name.

48.     In addition, Law.com (a Defendant ALM-owned website) is a subscription-based service. If non-subscribers saw the sensational headline about Mr. Soloway and wanted to read the article, they would be prompted to subscribe first to Law.com. This is another reason that ALM and Law.com posted their defamatory Article about Mr. Soloway: upon information and belief, ALM desired more subscribers, which motivated it to maintain its click-bait headline connecting Trump to Mr. Soloway's departure from Cushman.

49.     On April 14, 2023, New York Law Journal posted the article on Twitter (now known as X) with the caption, "Cushman Replaces GC in Wake of Company's Rebuke by Judge in Trump Probe."[12] The tweet linked directly to the defamatory article. That tweet—and its defamatory caption—remain online and available for the public to view to this date.

---

[12] A copy of the New York Law Journal tweet is attached hereto as **Exhibit 2.**



**A. The April Article falsely claimed Mr. Soloway was fired because of poor job performance and a legal proceeding involving the Trump Organization.**

50.      The title of the Article alone is false and defamatory because it states that Mr. Soloway was removed from his position as General Counsel because of a court's "rebuke" in a "Trump Probe." Even viewers of this headline who are not subscribers of ALM and Law.com could read the Article's headline and conclude that Mr. Soloway was fired from Cushman because of poor job performance relating to a legal proceeding involving the Trump Organization.

51.      Not only is the title of the April Article false and defamatory, but the first paragraph is, too. The first paragraph reads, "The real estate services giant Cushman & Wakefield replaced general counsel Brett Soloway, a move that comes eight months after a judge found the company

in contempt of court for not complying with subpoenas in New York Attorney General Letitia James' Donald Trump investigation."[13]

52.     The first paragraph of the April Article is false, misleading, and defamatory. The only conclusion that can be drawn from this paragraph is that Mr. Soloway was terminated or replaced as Cushman's General Counsel because the New York state court held Cushman in contempt after it did not timely respond to subpoenas relating to Donald Trump. This is not true, nor did Defendants have any basis to believe it was true. It is pure fiction.

53.     The truth is that Mr. Soloway was not terminated or replaced at Cushman because of a finding in a New York state case involving Trump. Mr. Soloway left Cushman on amicable terms that were wholly unrelated to any court proceeding involving the company. It makes no sense to connect the two events. This could have easily been discovered had Defendants reached out to Mr. Soloway or Cushman. However, Defendants did not reach out to Mr. Soloway or Cushman before publishing this false and defamatory April Article.

> **B. The April Article falsely claimed Mr. Soloway was ousted from Cushman on bad terms due to poor job performance.**

54.     The second paragraph of the April Article is also misleading and defamatory. It reads, "Chicago-based Cushman on Thursday announced that former Archer Daniels Midland legal executive Noelle Perkins will join the company as general counsel on July 1. The news release made no reference to Soloway, who had been general counsel for nine years. His bio was removed from the company's website."

55.     The second paragraph falsely implies that Mr. Soloway departed Cushman on bad terms that were connected to the "Trump Probe" for two reasons. *First*, the paragraph implies that Cushman did not mention Mr. Soloway in its press release for a specific reason—a negative reason

---

[13] **Exhibit 1**.

having to do with his job performance. The entire article must be read in the context of the headline and the Article's mentions of the Trump case (which has nothing to do with this change in the General Counsel position). The paragraph insinuates that if Mr. Soloway had left on good terms, he would have been mentioned as departing in Cushman's press release for its new General Counsel.

56.     The underlying assumption that Mr. Soloway's departure would have been announced by Cushman if he left on amicable terms is implicit in the April Article. That assumption is false. Mr. Soloway did not want his amicable departure to be publicly announced via a press release or otherwise. Mr. Soloway is a private person who purposefully keeps a low online profile. Additionally, Cushman was not required to announce Mr. Soloway's departure under SEC or any other regulatory or legal rules.

57.     **Second**, the second paragraph also implies that Mr. Soloway departed Cushman on bad terms based on the removal of his biography from the Cushman website without further explanation. The second paragraph emphasizes Mr. Soloway's website biography removal as being relevant and insinuates that if Mr. Soloway had left on good terms, his biography would not have been immediately removed without explanation.

58.     The premise that Mr. Soloway's website biography would have been removed with an explanation if he had left Cushman on amicable terms is false. Cushman is a publicly traded company. Cushman was not required to announce Mr. Soloway's departure under SEC or any other regulatory or legal rules.

59.     Mr. Soloway left Cushman on amicable terms that were wholly unrelated to any court proceeding involving Trump. This fact could have easily been discovered had Defendants

reached out to Mr. Soloway or Cushman. Defendants did not reach out to Mr. Soloway or Cushman before publishing the false and defamatory April Article.

### C. The April Article falsely insinuated that Mr. Soloway did not respond to comment on the Article because he was unwilling to discuss his poor job performance and the "Trump Probe."

60. The third paragraph is false and defamatory. It reads, "Cushman did not respond to requests for comment, and Soloway could not be located for comment. Soloway, who was last identified as General Counsel in Cushman's US Securities and Exchange Commission filings in March, was a senior Home Depot attorney before joining the company in 2014."

61. *First*, it is factually false that Cushman did not respond to requests for comment. On information and belief, Cushman was never contacted for comment about Mr. Soloway's departure. Had Cushman been contacted for comment, it would have informed Defendants that Mr. Soloway's departure from Cushman was amicable and wholly unrelated to any case, including the Trump matter.

62. *Second*, it is factually false that Mr. Soloway "could not be located for comment." The truth is that Defendants did not even attempt to reach out to Mr. Soloway for comment before publishing the false and defamatory Article. Mr. Soloway's email and phone number were easily discoverable in public records. Had Defendants reached out to Mr. Soloway, he would have informed them that his departure was amicable and wholly unrelated to any case, including the Trump matter.

### D. The April Article falsely claimed that Mr. Soloway's departure from Cushman was directly related to the Trump Organization and/or former-President Donald Trump.

63. The fourth paragraph is false, misleading, and defamatory. It reads, in relevant part, "Cushman raised the ire [of] New York State Judge Arthur Engoron last summer after initially battling James' subpoenas related to the company's years of work for the Trump Organization…"

18

To discuss Mr. Soloway's departure immediately followed by this news event, makes the two seem connected. To imply such a connection is false, misleading, and defamatory.

64.     Mr. Soloway did not depart from Cushman because of how a court treated a subpoena response regarding the Trump Organization. Mr. Soloway resigned from Cushman on amicable terms. To include discussion of Cushman's involvement in a Trump legal proceeding in the context of identifying and discussing Mr. Soloway's departure as General Counsel falsely implies the two events are connected in some way. They are not.

65.     The April Article was a blatant attempt to sensationalize a "story" about Cushman changing its General Counsel position by utilizing sentiments around legal matters involving Trump. The article, if merely about this General Counsel change, had no basis to discuss any legal proceedings involving Trump. The only reason is to capture website clicks—and put negative attention on Mr. Soloway and his performance as General Counsel of Cushman.

### III.     Defendants Acted with Actual Malice When They Published the Defamatory April Article About Mr. Soloway[14]

66.     Defendants lacked any reasonable grounds and acted with actual malice in stating or implying that Mr. Soloway's departure from Cushman had anything to do with the case involving Trump.

67.     Defendants did not cite any sources that establish a connection between the New York contempt order regarding former-President Trump and Mr. Soloway's departure from Cushman; they did not contact Mr. Soloway; and they did not contact Cushman. Defendants fabricated and published the April Article with knowledge or reckless disregard for its falsity.

---

[14] Mr. Soloway's discussion of Defendants' actual malice is not an admission that Mr. Soloway must allege and prove Defendants acted with actual malice to establish liability.

68.     Defendant Hugo Guzman has previously reported on straightforward changes in the General Counsel leadership position at large companies. Usually, there is no reason attributed to the change. In this case, however, Defendant Hugo Guzman did not merely report on a change in Cushman's General Counsel leadership. Instead, he chose to tie Mr. Soloway's retirement from Cushman to a sensationalist story about a "Trump Probe." This was an utterly unfounded conclusion and unreasonable inference.

69.     Defendant Hugo Guzman had no reason to infer that Mr. Soloway's retirement from Cushman had any relationship to the *Trump Organization* subpoena response and contempt order. Cushman's contempt order was lifted in the *Trump Organization* matter **seven months** before Defendant Hugo Guzman published his first Article about Mr. Soloway. Cushman was no longer in the news regarding the *Trump Organization* subpoena. The matter had been fully resolved. Yet Defendant Hugo Guzman drudged it up to create a sensationalist headline and garner more clicks and/or subscribers for Defendant ALM.

70.     Trump-related stories capture attention. This is widely known and would have been known to any publisher. The legal matter involving Trump that is referenced in the article about Mr. Soloway is also a story that has been highly publicized. Any publisher would recognize the attention-getting value of writing a story that references this Trump legal matter. It is click-bait, pure and simple. The Article, and its sensational headline, was clearly designed to obtain views and drive clicks, which in turn generates additional advertising revenue and general notoriety for a publisher.

71.     **Upon information and belief, Defendants published the April Article to garner more online "clicks" by connecting a well-known company (Cushman) and its General Counsel with a salacious Trump-related court filing months after Cushman's involvement**

20

**had ended.** Mr. Soloway was a mere pawn in the ploy of Defendants' corporate greed. More clicks on an Article equates to a higher bottom line for Defendants. An Article covering a General Counsel shift garners far less attention than one involving Trump. However, mention a "Trump Probe" and clicks will ensue.

72.     No other media companies or news agencies tied Mr. Soloway's departure from Cushman to Trump. In fact, no other media companies or news agencies reported on Mr. Soloway's departure from Cushman at all. That is because there was nothing noteworthy about Mr. Soloway retiring as Cushman's General Counsel. Mr. Soloway left Cushman on amicable terms to take time away from work and pursue other opportunities. In Mr. Soloway's case, an Article without a connection to Trump is not news. Given the amount of time that had passed, and the subsequent lifting of the contempt order, Defendant Guzman would have entertained serious doubts as to the connection between the *Trump Organization* case and Mr. Soloway's departure from Cushman.

73.     Defendant Hugo Guzman has previously reported on other General Counsel departures for ALM and Law.com. Defendant Hugo Guzman knows that it is possible to write about one General Counsel leaving and another entering a company without including false statements or insinuations. Here, upon information and belief, Defendant Guzman wanted to tie Mr. Soloway's departure to a salacious legal proceeding about Trump to make his article more sensational. Thus, he decided against drafting a straightforward "replacement of General Counsel" article and instead wrote a sensationalist headline and Article that would garner him and ALM more clicks.

74.     For example, in June 2023, two months after Defendant Guzman's defamatory April Article about Mr. Soloway, Defendant Guzman wrote an article entitled, "*Prada Appoints*

*New Chief Legal Officer.*"[15] Under the headline, Defendant Guzman wrote, "Francesa Secondari joined the luxury fashion house from an Italian law firm. She succeeds Cristina De Dona, who'd joined the company from The Hershey Co. in December 2021."

75.     Defendant Guzman's Prada article is a frank recitation of one General Counsel leaving a company and another taking her place. In this article, Defendant Guzman does not point out any litigation that Prada was involved in eight months prior because that was irrelevant to the transfer of General Counsel leadership. Mr. Guzman did not point out whether Cristina De Dona's biography was removed from or remained on the Prada website because that was irrelevant to the transfer of General Counsel leadership.

76.     The Prada article shows that Defendant Guzman can draft an article that has the same topic as the article Defendant Guzman wrote about Mr. Soloway (*i.e.,* one General Counsel leaving a company and another joining that same company) without defaming the outgoing General Counsel. **On information and belief, Defendant Guzman chose to publish a false and defamatory article about Mr. Soloway's departure from Cushman because he knew that re-hashing Cushman's non-party involvement in the Trump Organization lawsuit would garner more website clicks on his article, and ALM, his employer, would benefit financially. Mr. Soloway was an unwitting victim in this plan.**

77.     On multiple occasions following publication of the article, Mike Boonshoft, Cushman's head of public relations matters in the U.S., reached out to Defendant Guzman via email and voicemail to inform him of the factual inaccuracy of the article, as it relates to Mr. Soloway's departure. Defendants did nothing.

---

[15]     *See* https://www.law.com/corpcounsel/2023/06/02/prada-appoints-new-chief-legal-officer/ (last accessed Apr. 10, 2024).

78.     The April Article was not corrected or retracted on any of ALM's online brands where it was published, including Corporate Counsel or New York Law Journal. The April headline remains on New York Law Journal's Twitter. **The April headline remains online.**

79.     On August 8, 2023, Mr. Soloway, through counsel, sent a letter to ALM Chief Content Officer (Molly Miller) and Law.com's Editor in Chief (Zack Needles) demanding that Defendants correct the record by promptly retracting the article, issuing a correction, and desisting from further false reporting about Mr. Soloway and his departure from Cushman. The letter also stated that the false and defamatory headline should not be allowed to remain online.

80.     On August 24, 2023, Law.com Editor Greg Andrews emailed Cushman: "We at Corporate Counsel/Law.com are thinking of updating our story from earlier this year on Brett Soloway's departure. For that update, would you address what the reasons were for Soloway's departure and what effect, if any, the Trump case contempt order had on it?"

81.     On August 25, 2023, Cushman's Chief Marketing & Communications Officer Brad Krieger emailed Mr. Andrews: "As policy, we never comment on the reasons why executives leave our organization, ***but your story, suggesting a direct link between his departure and the contempt order, isn't accurate or factual***." (emphasis added).

82.     The August 2023 email from Cushman's CMO directly informed Defendants of the truth. There is no connection between Mr. Soloway's departure and the Trump contempt order.

83.     Defendants have refused to issue a correction, retraction, or apology for the April Article. On information and belief, Defendants kept the April Article online—even after learning the truth—because the Article connecting Trump and Cushman garnered website clicks and drove their revenues.

IV.     **Defendants Doubled Down in September 2023, Causing Further Harm to Mr. Soloway**

84.     In September 2023, *after* Defendants were contacted and told that the Article was false, the April Article was slightly refashioned, truncated, and republished by the Defendants on ALM's Corporate Counsel and New York Law Journal. It did not substantially change. It remained about Mr. Soloway. It remained false and defamatory, despite Defendants' knowledge of the truth.

85.     Notably, once they learned that the article was factually false, Defendants' reaction was not to remove the article or issue a retraction. Rather, Defendants chose to double down on their tortious publication. This fact alone speaks volumes about Defendants' actual malice. Defendants intended to benefit at the expense of Mr. Soloway. Defendants knew that the allegations about Mr. Soloway were false, but they republished them anyway. On information and belief, Defendants did not want to relinquish the benefit they had garnered from their ill-gotten website clicks. Defendants did not want to lose an article on their website about the Trump litigation, which is a frequently researched topic.

86.     On September 26, 2023, Defendants published a new version of the same article[16] (the "September Article"). This Article specifically references Mr. Soloway by name and is of and concerning him. The April Article remained available on Law.com until the September Article was published. Importantly, the April Article's defamatory headline still appears in a Google search for "Brett Soloway." (*See* Fig. 1, *supra*). The April Article's headline also still appears on Twitter (now known as X).

87.     The September Article is not a retraction, correction, or apology. In fact, the new version further amplifies the defamatory statements and implications regarding Mr. Soloway and

---

[16] See **Exhibit 3**. *Also available at* https://www.law.com/radar/card/cushman-replaces-gc-in-wake-of-companys-rebuke-by-judge-in-trump-probe-390-97535/ (last accessed Apr. 10, 2024).

his departure from Cushman, again attacking his fitness to serve as General Counsel of the company and completely fabricating the reason behind his departure from Cushman. The September Article about Mr. Soloway is false, misleading, and defamatory for the same reasons as the April Article.

88.     Defendants' further publication illustrates their knowledge and/or a blatant reckless disregard for the truth about Mr. Soloway's departure and corroborates Defendants' earlier knowledge of the article's falsity in connecting the two events. **Upon hearing the truth from Mr. Soloway and Cushman, Defendants made a conscious choice to republish their defamation, only confirming that Defendants acted with actual malice. Defendants knew that Mr. Soloway's departure from Cushman had nothing to do with a "Trump Probe," yet continued to connect the two.**

89.     The headline of the September Article is, "*Cushman Replaces GC Who Headed Legal Department During Trump Probe*." (The April Article's headline—which remains available on Law.com's News Radar alert and is accessible on Google—is*, "Cushman Replaces GC in Wake of Company's Rebuke by Judge in Trump Probe*."). The defamatory statement in the headline remains intact in the September Article. The headline still suggests that the General Counsel (Mr. Soloway) was replaced due to a "Trump Probe." Defendants have no basis to make this connection. It only serves to suggest that Mr. Soloway was unfit, or lacked competency and efficacy, in his job performance as the General Counsel of Cushman such that he had to be replaced.





90.     As shown in the screenshots above from Corporate Counsel and New York Law Journal (two ALM publications where the article is published), the September Article's byline is, "The real estate services giant says it has hired former Archer Daniels Midland attorney Noelle Perkins as legal chief. *It didn't explain the departure of Brett Soloway*" (emphasis added).

91.     The April Article's byline read, "The real estate services giant says it has hired former Archer Daniels Midland attorney Noelle Perkins as legal chief. *It didn't explain the*

*departure of Brett Soloway* who has been removed from the company's website" (emphasis added).

92.     The defamatory implication in the byline obviously remains intact from the April to the September Article. **The byline still suggests that Mr. Soloway was removed from his position as General Counsel due to a "Trump Probe." This imputes that his "replacement" stems from performance reasons, even though there is no reason or basis for this association to be made.** Additionally, the April Article's headline and byline remain available on Google. (*See* Fig. 1, *supra*).

93.     The September Article's first paragraph no longer states that Cushman has "replaced general counsel Brett Soloway," but instead reads, "The news release made no reference to Brett Soloway, who had been general counsel for nine years, during which a judge found the company in contempt of court for not complying with subpoenas in New York Attorney General Letitia James' Donald Trump investigation." **The defamatory implication in the first paragraph remains intact: the Article still suggests that Mr. Soloway's departure was connected to the former-President Trump subpoena contempt order.**

94.     The second and concluding paragraph of the September Article reads, "Soloway, who was last identified as General Counsel in Cushman's U.S. Securities and Exchange Commission filings in March, was a senior Home Depot attorney before joining the company in 2014." The September Article has no further information.

95.     The September Article is shorter than the April Article, but nevertheless further maintains and disseminates Defendants' defamatory implications. Without a doubt, the September Article implies that Mr. Soloway was removed from his position as General Counsel at Cushman

because the company was held in contempt of court in relation to a "Trump Probe." The Article connects the two events. Why else would the legal matter be included in such an Article?

96.    The September Article still does not mention that the contempt ruling was reversed before Mr. Soloway left Cushman. The September Article still ties Mr. Soloway's name with Donald Trump and/or the Trump Organization, *i.e.*, the "Trump Probe." The September Article still insinuates that Mr. Soloway left Cushman under a cloud of suspicion and due to allegedly poor job performance as a General Counsel.

97.    The September Article does not point out that Mr. Soloway denied the allegations. It does not inform readers of the truth that was communicated directly to Defendants from both Cushman and from Mr. Soloway himself: **Mr. Soloway's departure from Cushman had nothing to do with any legal proceeding involving the company.** The September Article does not report that Cushman unequivocally told Defendants that there was no link between Mr. Soloway's departure and the Trump subpoena. The September Article does not explain that there was a *seven-month* gap between the New York court's *reversed* contempt decision regarding the Trump subpoena and Mr. Soloway's departure from Cushman.

98.    On information and belief, Defendants republished the defamatory content about Mr. Soloway on at least two of its media publications (Corporate Counsel and New York Law Journal) because the April Article had already earned a lot of clicks. Defendants wanted to garner even more website hits. Defendants knew that maintaining the story's connection to a well-known Trump court case would garner more attention and thereby increase their bottom line. Defendants, like everyone else in the world, recognize that Trump-related stories immediately receive more interest, attention, and online clicks. Any reference to Trump makes a story more sensational. Mr. Soloway was just a pawn.

**V.** **Mr. Soloway and His Reputation Have Been Severely Damaged and Continue to Be Damaged By Defendants' False and Defamatory April and September Articles and Twitter Post**

99.    As of the date of this Complaint, when one searches "Brett Soloway" on Google, two of the top results that are populated are the false and defamatory April and September Article headlines. (*See* Fig. 1, *supra*). Mr. Soloway cannot escape the notoriety of the Articles. The false and defamatory September Article remains online and readily available on both Corporate Counsel and New York Law Journal. These are publications directed at the legal industry—the target audience for Mr. Soloway to seek future employment. The false and defamatory April Article's headline remains online and readily apparent. (*See* Fig. 1, *supra*). This headline is available to anyone searching his name online.

100.    When one clicks on the link to the defamatory September Article about Mr. Soloway, before the article can even be accessed, the following box pops up on the Law.com website. The text box draws particular attention to Mr. Soloway's departure as linked to the "contempt of court penalties" regarding the "Donald Trump investigation":



101.    Likewise, New York Law Journal's post on Twitter (now known as X) that links to the defamatory article remains online and readily apparent.

102.    When the April Article was first published, Mr. Soloway did not initially understand the full extent to which it would affect his longstanding reputation. But the April Article began appearing in conversations Mr. Soloway had regarding potential job prospects. It became abundantly clear to him that he had been irreparably harmed. Since departing Cushman, Mr. Soloway has engaged in multiple discussions concerning his candidacy for certain General Counsel or Chief Legal Officer opportunities. He, in fact, has lost employment opportunities as a result of the Articles. As Mr. Soloway has continued to search for new employment, the Articles have become an insurmountable obstacle.

103.    Mr. Soloway's name is forever tarnished. Companies and recruiters do not want to hire him or do business with him. Mr. Soloway has been removed from contemplation by recruiters and companies alike. **Now that his name has been falsely tied to the Trump litigation and alleged poor job performance, Mr. Soloway has been stricken from even being considered as a candidate for employment.** Mr. Soloway had no choice but to file this lawsuit to protect his good name.

104.    Mr. Soloway does not even have a chance to explain the Articles' falsity to prospective employers because he cannot even make it past a "screener" round of interviews. Frequently, the first action that a prospective employer takes—often even before an interview—is to "Google" their applicants' names. Among the first Google results when one searches "Brett Soloway" are the defamatory Articles. (*See* Fig. 1, *supra*). Mr. Soloway does not have a LinkedIn profile. Mr. Soloway does not have any online publications describing his accolades. Mr. Soloway purposefully keeps a low online profile. Thus, Mr. Soloway has no way to tell the companies he

is applying to that he successfully managed multi-million dollar legal, project, and operating budgets with full responsibility, or that he built from the ground up a global compliance platform for a public company. **The most detailed information available about Mr. Soloway online is Defendants' false and defamatory Articles that have forever tarnished his name and removed him from contemplation for General Counsel positions.**

105.    Mr. Soloway has felt direct and meaningful harm from the defamatory Articles. For example, Mr. Soloway has tried to engage two renowned, international executive recruiting firms, both of whom were initially eager to speak with him and expressed strong interest in helping him find his next position.

106.    First, Mr. Soloway reached out to the recruiter who placed him at DTZ, the position that led to his success at Cushman. That recruiter was delighted to hear from Mr. Soloway and eager to help him transition to a new lucrative position. **After the April Article was published, however, the recruiter's tone changed. The recruiter who initially helped Mr. Soloway get the DTZ/Cushman position—and was so happy to hear from him initially—completely ignored him.** On information and belief, that individual did not contact Mr. Soloway again because of the defamatory Articles.

107.    Second, Mr. Soloway spoke with another recruiter after the April Article was published. During their phone call, that recruiter specifically asked Mr. Soloway to explain the Defendants' April Article. Mr. Soloway explained that the Article was not based in fact; it was click-bait. His explanation did not matter. He never heard from that recruiter again. On information and belief, that individual did not contact Mr. Soloway again because of the defamatory Articles.

108.    Both recruiting firms that Mr. Soloway attempted to engage have refused to further communicate with him at all, let alone to present him with opportunities for employment. Given

his unblemished legal career, lack of prior online presence, pristine earlier reputation, and thirty years of leadership experience, the recruiters' pure disregard can only be attributed to the April and September Articles. The recruiters refuse to even *consider* putting Mr. Soloway on their list of candidates because of the April and September Articles.

109.    Prior to the Defendants' publication of the Articles, Mr. Soloway had an unblemished legal career. He spent decades working inside well-known public companies in senior, executive-level legal positions with zero reputational concerns and an impressive and spotless record. Now, he cannot even get recruiters to give him the time of day.

110.    Take another example. Mr. Soloway met with an in-house hiring recruiter for a General Counsel position via Zoom. The conversation was excellent: Mr. Soloway explained why his background and expertise would be a perfect fit for the company, and the hiring individual was clearly excited and impressed. Mr. Soloway was told that he would be hearing from the recruiter within a week about the next steps in the process; she further commented that Mr. Soloway is an incredible candidate, likely in "high demand," and wanted to ensure his application was expedited. Towards the end of the conversation, the individual asked about Mr. Soloway's online presence, to which Mr. Soloway responded that he does not maintain a LinkedIn. Mr. Soloway then watched as the individual likely pulled up Google, searched for his name, and saw the defamatory Articles. There was a pause in the conversation. Mr. Soloway watched the individual's face change composure. Mr. Soloway heard back about that position three weeks later with an automated rejection message—a far cry from the excitement he experienced during the Zoom call before his name was Googled, and despite the fact he had been told he would be hearing from them within a week. On information and belief, that individual did not contact Mr. Soloway again because of the defamatory Articles.

111.    It is undeniable that Defendants' Articles have tainted Mr. Soloway's professional reputation and adversely impacted his employment prospects. Despite his best search efforts over the past year, and his perfect track record as a legal industry leader, he has been removed from consideration and stricken from lists. He has been overlooked by companies, too. From March 2023 to present, Mr. Soloway has submitted his resume to many in-house legal executive positions. For all but a few, he has been utterly ignored. **It does not matter that his resume is spotless. The moment that executive recruiters and companies Google "Brett Soloway," they see the defamatory Articles and decide that anyone connected to a "Trump Probe" is not employable.**

112.    Mr. Soloway's reputation and future employment have been and continue to be harmed by Defendants' defamation. Mr. Soloway cannot find suitable employment. The Articles have ruined his professional reputation. Mr. Soloway's departure from Cushman will now forever be falsely tied to a Trump-related subpoena finding. There is a constant circus of legal proceedings involving Trump. Mr. Soloway's name is tainted by the false association made by Defendants between his professional departure and the Trump matter.

113.    Both Cushman and Mr. Soloway informed Defendants that the purported reasoning for Mr. Soloway's departure from Cushman was false and inaccurate in August 2023. **On information and belief, Defendants have refused to issue a correction, retraction, or apology because Defendants are pleased by the number of clicks the Articles are generating; publishing any story related to a Trump court matter is lucrative in the media industry.** The September Article is still available today. The April Article's headline is still available today.

114.    In his position as General Counsel of Cushman, Mr. Soloway earned approximately $2 million per year. Because of the Articles, Mr. Soloway has lost out on employment positions

where he would have earned a comparable or more lucrative salary. His earning potential has been brought to zero because of Defendants' Articles.

115.    On information and belief, had Mr. Soloway not been defamed by Defendants, Mr. Soloway's current salary would be more than $2 million per year. Mr. Soloway's compensatory damages against Defendants are currently accruing at least at a $2 million per year rate.

## COUNT I: DEFAMATION

116.    Plaintiff repeats and incorporates herein by reference each of the allegations set forth above as if fully set forth herein.

117.    The April and September Articles, written by Defendant Hugo Guzman (a Defendant ALM reporter) and published by Defendant ALM, falsely claimed without privilege that Plaintiff was replaced by Cushman as a result of a contempt order entered against Cushman in a case involving Trump. This concerned an existing fact that was capable of objective verification.

118.    The Articles specifically identified Plaintiff by name and were of and concerning him.

119.    The Articles were published and made available on ALM's Law.com-published brands Corporate Counsel and New York Law Journal, two publications that are available to ALM subscribers. The Articles were distributed by multiple ALM-branded publications online.

120.    The headlines of the Articles were published and are available online through a Google search.

121.    Upon information and belief, the content of the April Article was re-published by ALM on other platforms, including Twitter (now known as X). New York Law Journal posted a link to the defamatory article on Twitter.

122.     The Articles were defamatory, and in fact, also defamatory *per se*. By connecting Mr. Soloway's departure from Cushman with the contempt order in the Trump case, Defendants imputed that Mr. Soloway failed, or was unfit in performing his duties as the General Counsel of Cushman.  The Articles also imputed a lack of ability, competency, and efficacy by Mr. Soloway in conducting his trade, professional, and business affairs.

123.     Defendants failed to make any effort to obtain confirmation from Cushman or Mr. Soloway as to whether Mr. Soloway's departure from Cushman was connected to the contempt order. Defendants were also informed this was false.

124.     Defendants had no reasonable basis for the Articles. There was no logic to link Mr. Soloway's departure to the Trump case. Defendants thus knew that the Articles were false and/or published them with a reckless disregard of whether they were true or false. The actions of Defendants were therefore done with actual malice.

125.     On information and belief, the Articles were published to garner more "clicks" and generate profit and revenue for Defendants. Defendants have refused to remove the Articles because they are successfully generating revenue and profit through an increased number of "clicks."

126.     On information and belief, the Article was posted on New York Law Journal's Twitter to drive even more "clicks" on the article, to further generate viewership, profit, and revenue for Defendants.

127.     Mr. Soloway has sustained financial, reputational, and other injuries as a result of Defendants' defamation.  Such injuries (including legal fees) exceed $75,000.

**WHEREFORE**, Plaintiff prays for judgment in his favor and against Defendants for: compensatory and punitive damages and such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues triable as of right to a jury.

Dated: April 11, 2024

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

*/s/ Nicole E. Wrigley*
Nicole E. Wrigley
Maura T. Levine-Patton
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone: (312) 212-4949
Facsimile: (312) 767-9192
Email: nwrigley@beneschlaw.com
Email: mlevine-patton@beneschlaw.com

*Counsel for Plaintiff Brett Soloway*