UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRETT SOLOWAY., | |
| Plaintiff, | |
| v. | No. 24 CV 2925 |
| ALM GLOBAL, LLC AND HUGO GUZMAN., | Judge Georgia N. Alexakis |
| Defendants. | |

MEMORANDUM OPINION AND ORDER

Plaintiff Brett Soloway accuses publisher ALM Global, LLC, and reporter Hugo Guzman of publishing a defamatory article describing his exit as general counsel from real estate firm Cushman & Wakefield. [1]. Defendants ALM and Guzman ask the Court to dismiss plaintiff's complaint. [16]. Because the article is not defamatory as a matter of law, defendants' motion to dismiss is granted.

## I.  Factual Background

Plaintiff served as general counsel for Cushman & Wakefield between 2014 and 2023. [1] ¶ 14. In his capacity as general counsel, plaintiff "oversaw … all of Cushman's legal efforts," including litigation, and "oversaw outside counsel that Cushman hired for litigation matters." *Id.* ¶ 15. During plaintiff's tenure as general counsel, the New York Attorney General subpoenaed Cushman to produce documents in the *New York v. The Trump Organization, Inc., et al.,* litigation ("*Trump Organization* litigation"). *Id.* ¶ 30. In the summer of 2022, the trial court judge

presiding over the *Trump Organization* litigation criticized Cushman for "treat[ing] the looming [document production] deadlines cavalierly" and, in July 2022, held Cushman in contempt of court for failing to timely respond to the subpoena. *Id.* ¶ 31; [1-1] at 2. One month later, an appeals court lifted the contempt order. *Id.*

Seven months later, in March 2023, plaintiff "voluntarily resigned from Cushman on amicable terms." [1] ¶ 35; *see also id.* ¶ 4 ("[Plaintiff] departed Cushman on independent and friendly terms."). Then, on April 13, 2023, Cushman issued a press release announcing the arrival of its new general counsel. *Id.* ¶¶ 54-57; [1-1]. The press release mentioned neither plaintiff's name nor the reason for his departure. [1] ¶ 54; [1-1]. When Cushman released the press release, plaintiff's biography had been removed from the firm's website. *Id.* ¶¶ 54, 57.

The next day, April 14, 2023, defendant Guzman—a journalist for the legal publication Law.com, operated by defendant ALM—published an article with the headline "Cushman Replaces GC in Wake of Company's Rebuke by Judge in Trump Probe." *Id.* ¶ 38. The other relevant portions of the article are as follows:

- The subheadline read, "The real estate services giant says it has hired former Archer Daniels Midland attorney Noelle Perkins as legal chief. It didn't explain the departure of GC Brett Soloway, who has been removed from the company's website." [1-1] at 2.

- An introductory section was titled "What You Need to Know" and referenced, in bullet points, Cushman's "long-standing relationship with the Trump Organization," the "deluge" of subpoenas Cushman had received from the New York Attorney General, the July 2022 contempt holding, and the later lifting of the contempt holding. *Id.*

- The first paragraph noted that Cushman "replaced" plaintiff as general counsel in "a move that c[ame] eight months after a judge found the company in

2

contempt of court for not complying with subpoenas in New York Attorney General Letitia James' Donald Trump investigation." *Id.*

- The second paragraph identified plaintiff's successor; noted that Cushman's press release announcing her appointment "made no reference to [plaintiff], who had been general counsel for nine years"; and added that "[h]is bio was removed from the company's website." *Id.*

- The third paragraph claimed that "Cushman did not respond to requests for comment, and [plaintiff] could not be located for comment." *Id.*

- The rest of the article detailed Cushman's role in the *Trump Organization* litigation; its response to the contempt holding, including a statement from a Cushman spokesman that "the firm 'disagrees with any suggestion that the firm has not exercised diligence and good faith in complying with the court's order'"; the contempt holding's eventual reversal (accompanied by a hyperlink to a more detailed article on that development); and the professional background of Cushman's new general counsel. *Id.* at 3.

Defendants contacted neither plaintiff nor Cushman before the article's publication. [1] ¶¶ 61, 62.

In August 2023, four months after the article's publication, plaintiff sent a letter to defendants demanding its retraction. *Id.* ¶ 79. Approximately two weeks later, an ALM employee emailed Cushman to say that ALM was "thinking of updating [the] story from earlier this year on [plaintiff's] departure" and asked Cushman to "address what the reasons were for [plaintiff's] departure and what effect, if any, the Trump case contempt order had on it." *Id.* ¶ 80. Cushman did not disclose the reasons for plaintiff's departure, but replied that defendants' "story, suggesting a direct link between [plaintiff's] departure and the contempt order, isn't accurate or factual." *Id.* ¶ 81.

Soon after this exchange, in September 2023, defendants revised the article. *Id.* ¶ 86. The headline now reads: "Cushman Replaces GC Who Headed Legal

Department During Trump Probe." *Id.* ¶ 89; [1-3] at 2. The other relevant changes are as follows:

- The subheadline now reads: "The real estate services giant says it has hired former Archer Daniels Midland attorney Noelle Perkins as legal chief. It didn't explain the departure of GC [plaintiff]." [1] ¶ 90; [1-3] at 2.

- The first paragraph now reads, in part: "The news release made no reference to [plaintiff], who had been general counsel for nine years, during which a judge found the company in contempt of court for not complying with subpoenas in New York Attorney General Letitia James' Donald Trump investigation." [1] ¶ 93; [1-3] at 2.

The article, in both forms, remains online and readily accessible to anyone who uses Google to search plaintiff's name. [1] ¶¶ 99–101. Plaintiff alleges that defendants' work was defamatory—"falsely claim[ing] that [plaintiff] was fired for his job performance … in a highly publicized New York case involving Trump"—and has prevented him from working with recruiters and securing employment. *See, e.g., id.* ¶¶ 3, 103–12.

## II.  Legal Standards

To survive a motion to dismiss, a complaint must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court presumes all well-pleaded factual allegations to be true (as it has done in detailing the relevant factual background above) and views all plausible inferences in the light most favorable to the plaintiff. *Bridges v. Blackstone, Inc.*, 66 F.4th 687, 689 (7th Cir. 2023). To understand the full context of plaintiff's claim at the motion to dismiss stage, the Court must consider the articles attached to plaintiff's complaint, [1-1] and [1-3], which are critical to his allegations. *See Burlet*

*v. Baldwin*, 452 F. Supp. 3d 801, 812 (N.D. Ill. 2020) (considering a radio segment central to plaintiff's defamation claim when resolving a motion to dismiss).

Here, plaintiff claims that the article, in both original and revised form, is "defamatory, and in fact, also defamatory *per se*." [1] ¶ 122. To survive defendants' motion to dismiss, plaintiff must allege that defendants (1) made a false statement about him, (2) to a third party, (3) that caused damages. *See Bd. Of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*, 922 F.3d 827, 831–32 (7th Cir. 2019).

In Illinois, there are two categories of defamation: *per se* and *per quod*. *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003). A statement is defamatory *per quod* when extrinsic facts are required to show that it is defamatory. *Id.* In other words, in a defamation *per quod* action, a reader would need to know facts outside of an otherwise innocent article to understand the article as defamatory. *Id.*

In contrast, a statement is defamatory *per se* when it is so obviously and naturally harmful that proof of its injurious character is unnecessary. *Quilici v. Second Amend. Found.*, 769 F.2d 414, 417–18 (7th Cir. 1985). A reader would understand the defamation in an article just by reading that article. *Id.* Illinois recognizes five categories of defamation *per se,* but based on plaintiff's allegations only two are of interest here: "(1) statements that suggest that the subject can't perform his job because of lack of ability or want of integrity, and (2) statements that prejudice the subject in the pursuit of his trade or profession." *See Pippen v.*

5

*NBCUniversal Media, LLC*, 734 F.3d 610, 613 (7th Cir. 2013) (citing *Bryson v. News Am. Publ'ns, Inc.,* 174 Ill.2d 77, 88–89 (1996)).

Also of interest is a key exception to the category of defamation *per se*: A statement that is reasonably capable of an innocent construction is not *per se* defamatory. *See Green v. Rogers*, 234 Ill. 2d 478, 500 (2009). Under this "innocent construction rule," a court must give the defendants' words their natural and obvious meaning, while considering both the substance of defendants' statements and the context in which they were made. *Id.* at 499. Headlines, for example, must be considered alongside their accompanying article, rather than in isolation. *See Huon v. Denton*, 841 F.3d 733, 739 (7th Cir. 2016). And innuendo must not be considered at all. *Glassman v. Metro. Life Ins. Co.*, 616 F. Supp. 145, 147 (N.D. Ill. 1985) ("Whether the statement complained of is susceptible of innocent construction must be resolved by the court by viewing the statement stripped of innuendo."); *Harris Tr. & Sav. Bank v. Phillips*, 154 Ill. App. 3d 574, 581 (1st Dist. 1987) ("If the actual words spoken do not by themselves denote criminal (or unethical) conduct and in common usage have a more flexible and broader meaning than ascribed by plaintiff, then, as a matter of law, the words are nonactionable as defamation *per se*."). At the same time, "when the defendant clearly intended and unmistakably conveyed a defamatory meaning, a court should not strain to see an inoffensive gloss on the statement." *Green*, 234 Ill. 2d at 500.

Ultimately, if the statement is capable of two reasonable constructions—one innocent and one defamatory—the innocent construction prevails. *See Muzikowski,*,

477 F.3d at 904. "Whether a statement is reasonably capable of an innocent construction is a question of law for the court to decide." *Republic Tobacco v. N. Atl. Trading*, 381 F.3d 717, 727 (7th Cir. 2004).

## III. Analysis

### A. Plaintiff's Claim of Defamation *Per Se*

The overall thrust of plaintiff's defamation *per se* argument is that, by implying that Cushman fired him because of the contempt proceedings in the *Trump Organization* litigation, defendants' April 2023 article told readers—and potential future employers—that plaintiff was not good at his job. *See, e.g.*, [1] ¶ 122; [23] at 4 ("The 'gist' of the April Article is that Soloway was fired from Cushman for poor job performance."). With respect to that article, plaintiff itemizes its defects as follows:

First, plaintiff objects to the article's headline, which reads "Cushman Replaces GC in Wake of Company's Rebuke by Judge in Trump Probe," and its first paragraph, which notes that plaintiff's replacement came "eight months after a judge found the company in contempt of court." [1-1] at 2. He alleges that these statements "incorrectly connect[] [plaintiff's] retirement" to the *Trump Organization* litigation and convey that plaintiff "did something wrong" as Cushman's general counsel, thus "warrant[ing] Cushman letting him go and finding a replacement." [1] ¶¶ 38–39.

Second, plaintiff takes issue with the subheadline and second paragraph, which note that Cushman did not explain plaintiff's departure or mention plaintiff in its press release announcing the new general counsel, and that plaintiff's biography had been removed from Cushman's website.. [1-1] at 2. In plaintiff's view, these

statements again insinuate that he had performed poorly as Cushman's general counsel and left Cushman on bad terms. [1] ¶¶ 55–57.

Third, Cushman finds fault with the article's third paragraph, which reports that Cushman did not respond to a request for comment and that plaintiff could not be reached for comment. [1-1] at 2; [1] ¶¶ 61-62. According to plaintiff, both assertions are untrue. [1] ¶¶ 61-62.

One obstacle to plaintiff's piecemeal attack on the April 2023 article—i.e., his isolation of particular words, phrases, and sentences—is the Court's obligation, when applying the innocent construction rule, to asks how a "reasonable reader" might understand the article *as a whole*. *See Bryson*, 174 Ill. 2d at 102; *Harrison v. Chicago Sun-Times, Inc.*, 341 Ill. App. 3d 555, 570 (2003) ("Not only is the headline to be considered with the body of the article as a single entity, but the import of the entire article must be considered in reaching a determination of reasonable innocent construction.") (cleaned up). Could a reasonable reader understand the article to imply that plaintiff was fired because of his poor performance in the *Trump Organization* litigation? Possibly. But a reasonable reader also could understand the article more literally: that plaintiff left Cushman eight months after the contempt holding in the *Trump Organization* litigation, that the contempt holding was lifted before plaintiff's departure, and that plaintiff's exit was neither mentioned in Cushman's press release nor did his biography remain on Cushman's website. *See* [1-1] at 2-3.

To underscore the reasonableness of this latter construction, the Court responds more precisely to plaintiff's reading of defendants' words.

### *The Headline's Use of "In the Wake Of" and "Rebuke"*

Plaintiff takes great issue with the headline's use of the phrase "in the wake of." [1] ¶¶ 4, 38–39, 89; [23] at 3. According to plaintiff, the phrase can be read only to mean "because of" and, as a result, the headline can only be understood as stating that plaintiff left Cushman "because of" his performance with respect to the *Trump Organization* litigation.

Read as a whole, however, the April 2023 article contextualizes plaintiff's exit from Cushman within the firm's latest legal and personnel developments. It accurately describes plaintiff's professional background, Cushman's relationship with the Trump Organization, the events that led to the contempt holding, the overturning of the contempt holding,[1] plaintiff's exit from Cushman eight months later, his nonappearance in Cushman's press release and on Cushman's website, and the professional background of Cushman's new general counsel. *See generally* [1-1]. In fact, plaintiff is only mentioned in the first three paragraphs of the 13-paragraph article. *Id.* Even if a reader were to understand the headline to imply that plaintiff

---

[1] Plaintiff alleges that the article "omits key context: Cushman's contempt order in the Trump-related case was revoked in August 2022." [23] at 6; *accord* [1] ¶¶ 31, 96. This is incorrect. The article makes clear in its "What You Need To Know" section that "another judge later gave the firm more time." [1-1] at 2. Later in the article, defendants explain that "another judge later granted time extensions that allowed the company to avoid the fines." *Id.* at 2-3. The April 2023 article also provided a hyperlink to an earlier article that explains the lifting of the contempt order in greater detail. *Id.; see also* Cailley LaPara, *Cushman & Wakefield squirms out of Trump sanctions*, THE REAL DEAL (July 13, 2022), https://therealdeal.com/new-york/2022/07/13/cushman-wakefield-squirms-out-of-trump-sanctions.

was fired because of the contempt holding, that misconception would be cured once the reader read the actual article and learned that Cushman publicly defended the manner in which its attorneys responded to the subpoenas in the *Trump Organization* litigation; the initial contempt holding was later set aside by another court; and after it was set aside, plaintiff departed Cushman for unannounced reasons. [1-1] at 2-3.

Moreover, even if the "in the wake of" language were to be understood in isolation as plaintiff urges—say, in a tweet or Google search—it would still be susceptible to the innocent construction rule. [1] ¶ 86; [23] at 6. The Court may refer to dictionary definitions to analyze the meaning of a purportedly defamatory word. *See Seith v. Chicago Sun-Times, Inc.*, 371 Ill. App. 3d 124, 137 (1st Dist. 2007) (definitions are not dispositive, but they are persuasive). Under the innocent construction rule, a word or phrase that has multiple reasonable meanings—some defamatory, some innocent—is not defamatory *per se*. *See id.* (where a word has multiple defamatory and innocent meanings, it is "not necessarily" defamatory, and the innocent construction rules applies). As defendants point out, "in the wake of" is an idiom with two meanings: "after" or "after and … because of." [16] at 10.[2] It would be reasonable therefore to understand "in the wake of" simply to mean "after." And it

---

[2] *See In the Wake of*, Cambridge Univ. Dictionary, www.dictionary.cambridge.org/us/dictionary/english/in-the-wake-of; *accord In the Wake of,* Dictionary.com, www.dictionary.com/browse/in--the--wake--of (defined as "[i]n the aftermath of, as a consequence of," or "[f]ollowing directly on").

is true, and therefore not defamatory, that plaintiff departed Cushman after the contempt holding. [1-1] at 2.

Indeed, plaintiff seems to agree that this nondefamatory reading is also "plausible," but argues that "[i]t is far *more* plausible to read a defamatory meaning into the headline … than to read a non-defamatory, innocent construction." [23] at 7 (emphasis added). But when two constructions are plausible, as plaintiff seems to concede here, then the innocent one prevails. *See Harte v. Chicago Council of L.*, 220 Ill. App. 3d 255, 262 (1st Dist. 1991) ("[T]he innocent construction rule does not allow for the balancing of reasonable constructions.").

Plaintiff separately takes issue with the headline's use of "rebuke." [1] ¶ 4; [23] at 6. Plaintiff assumes without explanation that "rebuke" can only refer to the since-lifted contempt holding. *Id.* But the definition of "rebuke" extends far beyond contempt orders, and includes, for example, "sharp, stern disapproval; reproof; reprimand."[3] Recall from the April 2023 article that in the *Trump Organization* litigation, the court reprimanded Cushman for "cho[osing] to treat the looming deadlines cavalierly." [1-1] at 3. A reasonable reader could understand "rebuke" to refer to that expression of disapproval, rather than the contempt holding.

So, even if the headline were understood in isolation, it would still be nondefamatory under the innocent construction rule.

---

[3] *See Rebuke*, Dictionary.com, https://www.dictionary.com/browse/rebuke.

### *The Third Paragraph's "No Comment" and "Unavailable for Comment" Language*

Plaintiff takes issue with the article's third paragraph, which states that Cushman did not respond to request for comment and that plaintiff could not be located for comment. [1-1] at 2. Plaintiff alleges that defendants never attempted to reach either Cushman or him for comment. [1] ¶¶ 61-62. But to state a claim for defamation, a plaintiff must allege that "the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that [the] publication caused damages." *Bd. of Forensic Document Examiners, Inc.*, 922 F.3d at 831 (quoting *Green*, 234 Ill. 2d at 491). Keeping those elements in mind, these statements cannot be defamatory of plaintiff for three reasons.

First, Soloway is the only plaintiff in this case. To bring a defamation claim, plaintiff must allege that defendants "made a false statement about [*him*]." *Id.* (emphasis added). A statement made about a third party—here, Cushman—cannot defame plaintiff. Second, plaintiff alleges that defendants never attempted to locate him for comment. [1] ¶ 62. Yet he does not explain how a statement that concerns *defendants'* unsuccessful attempts to locate him is "about the plaintiff." *Id.* If anything, the sentence reflects poorly on defendants' investigative abilities. Finally, because he cannot establish the defamatory nature of the third paragraph, by extension, he does not sufficiently allege how it "caused damages." *Bd. of Forensic Document Examiners, Inc.*, 922 F.3d at 831.

\* \* \*

Returning to the big picture: The Court's reading of the April 2023 article—that plaintiff simply left Cushman eight months after the contempt holding in the *Trump Organization* litigation; that the contempt holding was lifted before plaintiff's departure; and that plaintiff was neither mentioned in Cushman's press release nor did his biography remain on Cushman's website—is one that is "natural," "obvious," and devoid of "innuendo." *See Bryson*, 174 Ill. 2d at 94. It is therefore not defamatory *per se*.

By comparison, plaintiff's interpretation requires a reader to make several linguistic and logical leaps: that "replaced" really meant "removed"; that "in the wake of" really meant "because of"; that "rebuke" really meant "contempt holding"; that because plaintiff's departure was not explained in Cushman's news release and his biography was unavailable on Cushman's website, he must have left on bad terms; that because he left on bad terms, he must have been fired; that because the article discussed the contempt holding, the contempt holding must have instigated his firing; and that because he was fired, he must have performed poorly in his job. [1] ¶ 44; [23] at 3-4. None of these implications are spelled out in the article and instead require plaintiff's extensive annotations to follow.

At bottom, defendant engages in a type of exegesis precluded under the innocent construction rule. *See Harris Tr. & Sav. Bank*, 154 Ill. App. 3d at 580 ("Harris' apparent need to alter, supplement and interpret the alleged statement of Phillips is conclusive evidence that Phillips' actual words were not, standing by

13

themselves, defamatory per se."); *Levinson v. Time, Inc.*, 89 Ill. App. 3d 338, 342 (1st Dist. 1980) ("Although plaintiff contends reports of his 'uncooperative' behavior suggest immoral motives or actions, no such exegesis is possible since the statements must be read 'stripped of innuendo.'"). Plaintiff's additions to, and contortions of, the article's words to support his defamatory interpretation thus provides strong evidence that the April 2023 article is not defamatory *per se*.

### *The September 2023 Version*

Plaintiff's claim fares no better when the Court turns its attention to the September 2023 iteration of the original article. Plaintiff argues that defendants' later updates to the original article only amplified its defamatory nature. [1] ¶ 87. He contends that the new headline—"Cushman Replaces GC Who Headed Legal Department During Trump Probe"—"still suggests that [plaintiff] was replaced *due to* a 'Trump Probe.'" *Id.* ¶ 89 (emphasis added). But, again, the innocent construction rule allows for a reasonable, non-defamatory reading of this headline: that Cushman replaced plaintiff, who happened to have been the firm's general counsel during the *Trump Organization* litigation.

Plaintiff's remaining contentions as to the September article mirror his contentions as to the April article and likewise falter under the innocent construction rule. [1] ¶¶ 90-97.

### B. Defamation *Per Quod*

Despite not mentioning defamation *per quod* in his complaint,[4] plaintiff alters course in his response and argues that he "adequately" pled both defamation *per se* and *per quod*. [23] at 8. The two forms of defamation have different pleading requirements. To assert a claim of defamation *per quod*, a plaintiff must allege (1) extrinsic facts to establish that the statement is defamatory, and (2) special damages, with specificity. *See Pippen*, 734 F.3d at 613–14; *Fedders Corp. v. Elite Classics*, 279 F. Supp. 2d 965, 969 (N.D. Ill. 2003). Plaintiff's complaint does neither.

#### *Extrinsic Facts*

To allege defamation *per quod*, a plaintiff must allege that the defamatory meaning can *only* be established by referencing extrinsic facts. *Dornhecker v. Ameritech Corp.*, 99 F. Supp. 2d 918, 933 (N.D. Ill. 2000). This is quite opposite of defamation *per se*, where defamation is obvious on the face of the statement. *See Quilici*, 769 F.2d at 414. As an example of defamation *per quod* provided by one Illinois court (in 1902): an otherwise innocent report of a mother's delivery of twins became defamatory *per quod* where the mother showed, as an extrinsic fact, that some readers knew she had been married for only one month. *See Bryson*, 174 Ill. 2d at 87 (citing *Morrison v. Ritchie & Co.*, 39 Scottish L. R. 432 (1902)). And if an article did not mention a plaintiff's name, but the plaintiff showed through extrinsic

---

[4] In response to defendants' motion to dismiss, plaintiff claims he adequately raised defamation *per quod* when he stated that "[t]he Articles were defamatory, and in fact, also defamatory *per se*." [23] at 8 (citing [1] ¶ 122). He does not explain how this phrasing was intended to apprise defendants of a defamation *per quod* allegation. *See* [16] at 10 n.6 ("[T]he Complaint does not plead or even mention defamation *per quod*."). In any event, even if plaintiff had mentioned defamation *per quod*, he still failed to properly allege it.

evidence that readers understood the article to refer to him, that article, too, would be defamatory *per quod*. *See Barry Harlem Corp. v. Kraff*, 273 Ill. App. 3d 388, 390 (1st Dist. 1995). In other words, in a defamation *per quod* action, extrinsic facts turn an otherwise innocuous statement defamatory.

Here, plaintiff does not plead such extrinsic facts. [23] at 13-14. Indeed, he cannot plead such facts because he takes pains in his complaint to allege that a reader need only look to the article's headline, or its paragraphs in isolation, to understand its defamatory meaning.[5] Because "*[p]er quod* statements are not defamatory on their face and require extrinsic facts or innuendo to explain their defamatory meaning," plaintiff's claim—by its very nature—is one of defamation *per se*, rather than defamation *per quod*. *See Barry Harlem Corp.*, 273 Ill. App. 3d at 394.

In response, plaintiff list facts taken from his complaint that he tries to cast as extrinsic. [23] at 8-9. These facts include that his resignation from Cushman was unrelated to the *Trump Organization* litigation; that information concerning the lifting of the contempt holding was available publicly; that Cushman was represented by two firms during the *Trump Organization* litigation rather than by plaintiff directly; that Cushman was not a party to the *Trump Organization* litigation; that Cushman was not legally required to announce plaintiff's departure; and that

---

[5] *See* [1] ¶¶ 38 ("The headline of the Article alone, in addition to the Article as a whole, are false and defamatory."); 49 (the tweet with the article's headline is defamatory); 50 (the headline is defamatory); 51 (the first paragraph is defamatory); 54 (the second paragraph is defamatory); 56 (defamation is "implicit" to the article); 60 (the third paragraph is defamatory); 63 (the fourth paragraph is defamatory); 99 (defamatory headlines are apparent to anyone who searches plaintiff's name on Google); 111 ("The moment that executive recruiters and companies Google 'Brett Soloway,' they see the defamatory Articles and decide that anyone connected to a 'Trump Probe' is not employable.").

defendants did not reach out to plaintiff for comment before publishing their article. *Id.*

Some of these facts are reflected in the article itself. Others are undercut by plaintiff's own allegations. *See, e.g.*, [1] ¶ 15 (alleging that plaintiff "oversaw … all of Cushman's legal efforts," including litigation, and "oversaw outside counsel that Cushman hired for litigation matters"). All of them establish that plaintiff understands defendants' article to be false. But none of these facts "establish[] that [defendants' article] was interpreted as being defamatory" by its readers. *See Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 416 (1996). For this reason alone, plaintiff has failed to allege defamation *per quod*.

### *Special Damages*

Even if plaintiff could point to extrinsic facts, he still fails to plead defamation *per quod* because he did not specifically state special damages. *See* Fed. R. Civ. P. 9(g) ("If an item of special damage is claimed, it must be specifically stated.").

Plaintiff claims that his damages are his failure to obtain interviews or maintain a relationship with a recruiter, [1] ¶¶ 105-08, 110, which resulted in a loss of $2 million a year from failed job opportunities, *id.* ¶ 115. But there are two problems with this allegation.

First, "the failure to obtain an interview or further inquiries from a recruiter would not sufficiently establish defamation *per quod*." *Kapotas v. Better Gov't Ass'n*, 2015 IL App (1st) 140534, ¶ 73 (1st Dist. 2015). Second, though plaintiff claims $2 million yearly in damages, this figure is simply his salary before he left Cushman. [1]

17

¶ 114. He does not allege that plaintiff's article caused him to be denied any one specific job that would have earned $2 million annually. *See Pippen*, 734 F.3d at 614 (plaintiff's allegations of special damages were sufficient because he "itemized losses … he identified specific business opportunities that had been available to him earlier but that, following the defendants' statements, were available no more").

## IV.    Conclusion

Plaintiff has failed to allege that defendants' original article, and its later iteration, defamed him *per se*. Moreover, by stressing that a reader need only look to the article to understand its defamatory meaning, plaintiff has failed to establish defamation *per quod*. Plaintiff's complaint [1] is dismissed without prejudice.[6]

If plaintiff elects to file an amended complaint, he must do so on or before November 7, 2024. In an amended complaint, plaintiff may advance a theory of defamation *per quod*, but in light of the Court's analysis of defendants' words above,

---

[6] Defendants propose three alternative grounds on which to dismiss plaintiff's complaint outright: that the article is protected under Illinois' fair report privilege, [16] at 11; that any implication that plaintiff's departure from Cushman was connected to the *Trump Organization* litigation is protected as an opinion, *id.* at 14; and that the article is substantially true, *id.* at 13. These defenses are not at this time persuasive to the Court. First, the fair report privilege requires that the article be a "report of an official proceeding." *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1104 (N.D. Ill. 2016). Defendants' article was not limited to reporting an "official proceeding": It also discussed plaintiff's departure from Cushman and Cushman's incoming general counsel. [1-1] at 2-3. Second, opinions are only protected when they "cannot reasonably be interpreted as stating actual facts about the plaintiff, when viewed from the perspective of an ordinary reader." *Doctor's Data Inc.*, 170 F. Supp. 3d at 1113 (cleaned up). Nowhere in the article do defendants clearly express a subjective view or interpretation. *Id.* Therefore, an ordinary reader could reasonably interpret the article as stating actual facts about the plaintiff. Finally, the question of substantial truth is typically reserved for the jury. *Ludlow v. Northwestern Univ.*, 79 F. Supp. 3d 824, 837 (N.D. Ill. 2015). In any event, defendants make clear that their substantial truth defense "goes hand-in-hand with their opinion argument," [26] at 9, so the Court declines to address it at this time. Defendants are free to raise these defenses in future motions.

plaintiff may not advance a claim based on defamation *per se*. Defendants' motion to stay discovery [17] is denied as moot.

Georgia N. Alexakis
United States District Judge

Date: October 18, 2024